The U.S. Court of Appeals for the Federal Circuit is now open and in session. God save the United States in this honorable court. Counsel, are you ready to proceed? I am, Your Honor. Thank you. You may begin. Thank you. Thank you, Judge O'Malley, and good morning, Your Honors. May it please the judge substituted his view of the damages for the jury's, reducing it by 82%. And review here is, of course, de novo. Your Honors, patent damages under Section 284 are compensatory. In a reasonable royalty analysis, the law restores the patentee to the pecuniary condition it would have had if the infringement had not occurred. And where a comparable license is in evidence and receives its full weight, the jury can use that license to find the royalty rate and the base. So there are three reasons here, Your Honors, why the court should restore the damages judgment. First, in this appeal and at the jury trial, both technological and economic comparability of the QBAR license are established. The QBAR license establishes a worldwide sales, royalty base for sales by a non-United States company. So the jury had a factual basis for concluding, as it did, that all of the infringing devices that reach U.S. soil, wherever first sold, should be included in the base. And this was consistent with the jury's Georgia-Pacific instruction, particularly Factors 1 and 15. They received the typical... Counsel, counsel, let me ask you, though. The indirect infringement, the jury did not find in your favor, correct? That is correct. All right. So the problem I'm having is it's not a question of whether someone in a license could contract for something more than it might have been able to...or it might have been liable for. In this particular instance, what you have is a situation where those foreign sales were not actually infringing. Isn't that right? The completely extraterritorial sales would not give rise to a legal injury. So to that extent, that's right. But they could be counted...when they get imported, they can be counted in the damages. And that's what the... But they weren't imported by the defendants, right? Well, they weren't...just like in CMU, they weren't...in the CMU case, those chips were not imported by anyone who had an adjudged liability against them. For example, while there wasn't an inducement verdict as well as direct infringement in CMU... Right. I think that's critically different, don't you? Well, the actions that constituted the direct infringement for the inducement liability were the customer actions in San Jose, California, using the claimed method on simulators, side by side with the people trying to sell those simulators or sell the chips to them. So even in CMU, where importation damages got measured, the act of direct infringement by both the seller and the customer was not at all tied to the importing. And that's why in the CMU decision, we have this comment which says, quote, significantly, once one extends the extraterritoriality principle to confining how damages are calculated, it makes no sense that the action respecting the product being used for measurement itself be an infringing action. That's from page 1306. So I hope that answers your question, Judge Romali. Was there something further, or shall I proceed? Well, I still think that there's a distinction here, and that is, again, that there was the I'm also concerned about basic causation here. I mean, when those products were sold as foreign sales, they were non-infringing sales. And you're saying that when a third party imports them, that they become infringing sales attributable to the original foreign seller? Not precisely, Your Honor. When there's importation, they become qualified to be included in the And so to address causation, you know, Your Honor, Georgia-Pacific Factors 1 and 15 bake in the causation question. And when there is evidence supporting the jury verdict under those factors, that's already intrinsically taking care of causation, because the prudent businessperson under Factor 15 would select a measure of damages that makes sense for the business purposes, and in this case, the measure of a licensed royalty base. So in this case, the licensed royalty base, quite rationally, could have and did include the chips that got onto United States soil, because by doing so, you exhaust the patent rights as to those chips. And I could understand the point, and I'll let you go on after this, but if you had, for instance, either gotten an inducement verdict or you had claimed contributory infringement and there was only one possible use for these chips, and they knew at the time of sale that they were necessarily going to come into the United States, I think it would be a different circumstance. But what you're asking us to do is to say, essentially, that 271A can apply to foreign sales. All we're saying is that when you get to Section 284 of the Patent Act and you interpret that section, just like in CMU, the measure of damages, the focus of Congress's solicitude, if you will, looks back to the types of activity with regard to the unit that can happen under 271A. And as CMU analyzed the pure statutory interpretation question, since importation into the United States is included in 271A, it kind of reverts back to the territorial scope of 284. So it's a measure of damages question. Once liability is found, then you look to the hypothetical negotiation, which bakes in all the causation you could care about. And if, as the jury found, the hypothetical negotiation on comparable licenses would result in this rate and this base, then everything should be fine. So that's just one final point on that. We actually did use the CMU case as a blueprint at trial. When we asked the jury, we actually asked the jury to reduce the award from 100% of global sales to just one-third of global sales. So we asked them, we guided them, based on that blueprint, to take out two-thirds of the global sales. So finally, Your Honor, this is just my third point, I guess, and final point on why the jury reversed on damages. It's that under Ninth Circuit standards, Your Honors, power integrations just didn't preserve a JML motion. They didn't preserve a JML challenge to the jury award in the first place. And the reason for this, it's quite apparent, they didn't present the jury with any alternative calculation during trial. And we cite the Matos decision in our briefing that establishes that this is a waiver under regional circuit law. And I'll just ask the rhetorical question, how can a party tell a court that the jury's calculation exceeds a maximum without having first told the jury what the maximum is? Your Honor, we believe that's a waiver. So the award in this case was a direct infringement award, just like the award in CMU. One final point on CMU, Your Honors. Page 643 of that district court decision shows that the award in CMU itself was entirely based on direct infringement. In other words, the award in CMU, it was a direct infringement award. And in fact, it was based on quote-unquote sales cycle infringement. And that place in that decision says that had there been separate counting of inducement damages, that would have increased the award. The reason I bring this up is because it makes it even more clear that our facts line up one for one with CMU in the sense that the award in this case was a direct infringement award, just like CMU's. And there's really no true factual distinction there. So for these reasons, Your Honor, OptiCurrent asks that this court reverse the JML ruling, restore the full jury award, and remand for further interest in ongoing royalty proceedings. And since I have about a minute left in my opening, I wanted to raise one point for Your Honors to consider, if that's all right, while you hear from my colleague on the cross appeal, and then I'll reserve my remaining time. So I'm turning now to the infringement question. Your Honors, Judge Gilstrap issued a well-reasoned opinion on claim construction. It was consistent with Phillips, and it included his citation of column 14, starting at line 42 in the patent. And this is where the patent talks about an embodiment that includes a fourth pin that operates both with and without power applied to this fourth pin. And the clincher is that line 48 of the patent, column 14, then says that this precise variation is, quote, intended to be within the scope of the present invention as defined in the appended claims. That's the important language, the appended claims overlooked by my colleague. And all of the appended claims, Your Honors, have the phrase of a, quote, switch having only three terminals. Putting all this together, this means that you can have an only three terminal switch, even if there is a fourth pin that operates with or without a capacitor attached to it. And Judge Gilstrap, by the way, he also cited column 1, lines 50 through 55, which describes what a switch having only three terminals looks like to a person of skill and the art, one that does not require a fourth terminal connected to a power supply. So Judge Gilstrap got it right. And Your Honors, I'd like to reserve my remaining time. Thank you. That's fine. Good morning, Your Honors. Frank Scherkenbach, Maid Police of the Court. May I proceed? Yes. Thank you. I'd actually like to start where counsel left off, which is with claim construction, because we view that as the dispositive issue in this appeal. And I will address the column 1 and column 14 excerpts that counsel referred to, but that actually is not the place to begin. The place to begin is with the plain and ordinary meaning of the language. And it doesn't get any more plain and ordinary than the word only. Only means only. And that really disposes of this appeal. It doesn't mean four. It doesn't mean five. It doesn't mean extra terminals connected in some, not connected in a particular way. It means what it says. That's the language. Well, it doesn't, I mean, I don't think the judge disagreed with you that only means only. What he, I thought what his construction was is that what you point to as supposedly the fourth terminal wasn't really a fourth terminal. No, Your Honor, I don't think that's quite, that's quite right. Judge Gilstrap, so there's two different things here. Judge Gilstrap did say the language was clear out of space. I agree with you. He did not rely on lexicography or disavowal. He in fact quoted sections of the specification that talk about how three terminals are preferable to four and how there are advantages to having three terminals and so forth. OptiCurrent argues in its brief that there was some evidence our devices didn't have a fourth terminal. But that in fact is not what the evidence was at trial. And indeed their lawyer never actually really made that decision, decided the JMOL motions, accepted the fact that our devices indeed had four terminals. The issue was whether the fourth terminal was connected to a power supply or not. And in fact, OptiCurrent's expert himself agreed that what they pointed to as the fourth terminal was the pin that was used to connect to an external capacitor. And the definition of, the greed definition of terminal in this case is an external connection point. So, and that, by the way, their expert's admission in that regard is in the appendix at 3746. And so the issue, Judge Gilstrap, with all due respect to Judge Gilstrap, you read his claim construction opinion and it seems to be headed exactly the right direction until the judge gets to this excerpt in column 14 and wrestles with that. And I think where this now has come out is OptiCurrent is making a present invention argument. And I think without actually having engaged with that case law in its briefs or what the standard is, it seems now to be saying, well, when you have a statement of the present invention like that, that can, in effect, redefine or disclaim or change the meaning of otherwise clear language. And while that's true conceptually, and this court has found that on certain facts, you really don't have those facts here. Those cases involve situations where the specification uniformly and consistently uses the phrase present invention to refer to a feature in the same way throughout the specification. I would direct the court actually to... But how do we get around the fact that in the preamble, it starts with the phrase a and it points to several places in the specification or written description that define non-inverting transistor switches as having, if there's a fourth terminal, that terminal being connected to a power supply? I think there's only the one counter example, Your Honor, and that's the column 14. Indeed, one of the, I think, most powerful points on this issue is the spec only shows three terminals when it talks about, when it uses the phrase only three terminals, it consistently shows and describes only three terminals when it describes, if you look, for example, at every one of the figures, that's an embodiment of the invention. Well, he cited column one, not just column 14, right? He did, he did, Your Honor, and if you look at that language in column one, that language as well says non-inverting... I'm looking at column one now, beginning at line 47. Well, 38 to 44. Okay. 38 to 44, that's actually talking about... 38 to 55, actually. Yeah, okay, but the portion, and within that excerpt, the portion that Judge Gilstrap cited was the portion beginning around about 45, which is talking about the prior art, by the way, so the patent is saying non-inverting switches, which comprise only three terminals, are well-known and widely used in the art. So this is not the invention, this is the prior art, okay? And then it continues, non-inverting transistor switches, which comprise only three terminals, include a first terminal connected to an input signal, a second terminal connected to a ground, and a third terminal connected to a load. That's it. They have three terminals, not a fourth, let alone a fourth not connected in some special way. And so we don't see how this actually supports the construction that Judge Gilstrap ultimately arrived at. And then if you go... Oh, let me just finish, sorry. Perhaps this is where you were going. This is Judge Bryson. I'm interested in going back to column 14, that paragraph at the end of the specification. Yes. You characterized that as a present invention-type paragraph, but it seemed to me, and I think Mr. Greenspoon may have alluded to this, that the biggest problem for you, as I see it, in the last sentence, refers to the invention not simply as a broad invention, which may be broader than the specific invention recited in the claims, but it refers to the present invention as defined in the claims. And that language seems to me to undercut your argument that the language in the specification may be broader than the claims. Could you comment on that? Yes, Judge Bryson. I think this boils down to whether the court is prepared to say, as a general matter, that that's sort of boilerplate. And it is boilerplate. It is the last sentence in the specification, as defined in the appended claims, trumps the repeated and consistent contrary use of the plain and ordinary language in the rest of the specification and the claim language, and the plain and ordinary meaning of the claim language, which clearly says only. Let me ask my question this way. Is there a way that you can, setting aside simply saying it's boilerplate and therefore should be ignored, is there a way you can square that language with your proposed claim construction? Well, yes. The most obvious is that this section in column 14 doesn't use the word only. Whatever it's talking about here as being within the scope of the present invention, it's not referring to a switch with only three terminals. But all of the claims recite switches with only three terminals. So when the language defined in the appended claims, wouldn't that encompass precisely that? Only three terminal switches. Well, I don't think so. I think that's the disconnect here. The specification is talking about a potential other embodiment. It certainly is established that the claims that actually get issued in a patent don't have to cover every embodiment disclosed in the facts. That's true as a general matter, but the question is why that last sentence doesn't foreclose that argument other than by your simply saying, well, it's boilerplate and therefore we can ignore it. Well, I think the answer then has to be they may have intended to submit claims or have claims or at least reserve the right to submit claims that would have covered the broader embodiment, but those aren't the claims they wrote. The patentee has total control over what they claim and how they claim it and what language they use. There's plenty of cases from this court that say, look, the spec has multiple different embodiments. Some are claimed, some are not. And when the claims used in their language, language that ties to one set of embodiments but not the other, that's the way it comes out. Those claims cover part of what's disclosed in the spec and not the rest. I'm entering my rebuttal time. Before you sit down, and maybe we'll just have to use up some of your rebuttal time, because I think that we need to talk about the damages question. What does the Supreme Court's decision in Western Gecko do to this analysis? I don't think it has any impact here, Judge O'Malley, because that case turned on the factual finding that the domestic infringement caused the foreign loss. And here, there's not even any allegation that the 6% or so of power integration sales in the U.S. caused any foreign impacts of any kind and certainly didn't cause any foreign loss. So that isn't really the case that applies here. You heard counsel candidly say they built their trial presentation on the Carnegie Mellon approach instead, and they did. The problem for them is Carnegie Mellon turns on inducement. Their trial presentation turned on inducement. They tried to prove inducement, and they were unsuccessful in doing so. And so while there's evidence of importation in the record, and they wish that this were a Carnegie Mellon case, it's not a Carnegie Mellon case. And on that issue, the court's discussion of damages in Carnegie Mellon focuses on 271A, direct infringement, because the importers were the direct infringers. It's just important to understand the basic facts of the case. But isn't it true that when those sales occurred, those foreign sales occurred, that everybody understood that they were in the types of devices that then would generally get a large portion imported into the United States? It certainly was understood that some portion would end up in consumer electronic devices in the United States. That's true. But, of course, inducement requires a whole lot more than that, including those shipments like that in a damages basin requires more than that. And here, there is no finding of inducement, whereas in Carnegie Mellon, that was the central portion of the analysis. The importers there were the third-party customers, and Carnegie Mellon, excuse me, Marvell was the defendant, had been found to have induced those customers to infringe via importation. And the court in that case said, okay, look, we can't affirm the worldwide damages award. That's way too broad. The only part that we can affirm is the inducement part, because the act of an importation is a direct infringement by the end customers. And if you look at the opinion 807F third, in any number of places, it's very clear. It's only the inducement via importation part of that award that got affirmed, 1288, 1302, 1308. All right. One last question, and that is, what is your response to your friend on the other side saying that you actually waived any ability to seek a lower damages amount  Well, we covered this in the briefs, Your Honor. It's their burden, of course, on damages, not ours. And so we're not obligated to put on any damages case. We're not obligated to put a witness on or argue it. We cited the NPLAS case on that issue, E-N-P-L-A-S, NPLAS display, which is a case where the defendant did that, did just that, didn't put on a responsive case. And pointed out that as a matter of law, the award that the plaintiff got was legally flawed and had to be set aside. And the court said, that's right. You don't have to put on your case. The issue is whether the award the plaintiff got is legally supportable or not. There's also Ninth Circuit authority that we cited and that OptiCurrent didn't respond to that specifically says there's no requirement to argue to the jury an issue on which the arguing party has moved for J-Mall and subsequently renews a J-Mall motion on. Argue things to the jury, not argue certain things to the jury, but the issue on J-Mall at the end of the day is whether the judgment that you're challenging is supported by legally sufficient evidence. Okay, thank you. I'll give you three minutes for rebuttal since I'm the one who kept you going. Thank you, Your Honor. You're welcome. Your Honor, this is Rob Greenspan again. May I proceed? Yes. Thank you. Starting with the last thing that we heard from Mr. Schirkenbach, of course, as we argued in our briefing, we did respond to the point he made about NPLAS. If a party takes a risk and decides not to put part of its case on in front of the jury, it has the power to do that. We don't dispute that. But it must live with the consequences of the trial risks that it takes, and in this case, the consequence under the Mattos decision, which I didn't hear Mr. Schirkenbach rebut, under the Mattos decision in the Ninth Circuit, that means that one has its hands tied about presenting an alternative calculation that it didn't present to the jury. And then moving backwards a little bit, still on the topic of damages, what I heard from Mr. Schirkenbach was about CMU, the importers were the direct infringers for the inducement liability. That's what he said. But quite respectfully, he just simply misread CMU, and the proof of that is at page 593 to 594 of the district court decision, which indicates that the underlying direct infringement that triggered the inducement liability was, as I said in my opening, which was the customers standing side-by-side with the sellers in Santa Clara, California, while they were performing the simulation testing, the quote-unquote sales cycle infringement as described in that decision. There's nothing in either the district court nor the appellate decision giving a whiff of an idea that the importation into the United States was the liability or injury measure. Now, as to Western Gecko, what does that do to the analysis? Western Gecko came out later, by a year or two after CMU, but it validated the pure statutory analysis. That's my answer to that question. There's lots of questions as to whether it actually overruled CMU, right? Well, we've never heard any sort of argument like that from my colleague, but it didn't overrule CMU at all. Instead, it said, look, we're going to do the same thing that they did in CMU. We're going to look at 284. We're going to conclude that 284 works in tandem with other provisions. That's 271A, et cetera, et cetera. Obviously, there is a difference between Western Gecko and CMU, lost profit versus reasonable royalty. There's nothing in the Western Gecko decision that suggests that the reasonable royalty side of the analysis that the CMU court did was in any way incorrect. Does it matter that Western Gecko addressed 271F and not 271A? That only means it's of limited applicability to this case. 271F, you know, obviously is not the basis for liability in this case. CMU, however. That's part of my point, right? Right. Where 271F actually talks about exporting of components, right? In my response, Your Honor, is that Western Gecko is not directly analogous in the same way that CMU is absolutely directly analogous. Okay. And very quickly, just on some of the infringement issues, I was very surprised to hear from Mr. Scherkenbach that he continues to say that we didn't make the argument to the jury that the fourth pin is not a terminal because at page 888 of the transcript, that's the closing argument, docket entry 282, counsel said, quote, the bypass pin is the internal supply voltage node. There's nothing external about it. It's not an external terminal under the court's definition. That was an argument made to the jury. What's the appendix site for that? It is in the appendix as such, which is page 4288. It did not end up in the printed appendix because this argument came out in the fourth brief. Okay. But it is in the, of course, the district court record that the court can consider, docket 2019, page 888 of the trial transcript. Thank you. So, and finally, I would mirror suggestions in the words of Judge Bryson that at the end of the patent, column 14, that's not a boilerplate present invention statement. That's a specific example of an embodiment, followed by an exhortation that this embodiment is considered to be and intended to be within the scope of the appended claims, which, by the way, all the independent claims have the only three terminals language and always have. The very last point I'll make is I did not hear any attack from Judge Gilstratz's to discern what a bill would be aware of, which is the entire claim construction exercise. And if there are no further questions, thank you very much, Your Honors. Thank you. Thank you, Your Honor. Frank Shurkenbach again. Just to respond quickly on this point about their lawyer arguing at trial that the four pin, the BP slash M pin was not an external connection. Yes, the lawyer made that statement in argument, but that's not evidence. The only evidence on the issue is that our expert testified that a fourth pin is an external connection, like all the other pins on the chip. There aren't any proofs too much. If the fourth pin is not an external connection, neither are the other three. And, again, their own expert conceded that the BPM pin is the pin that is used to connect to an external capacitor. I pointed that out in my opening argument. It's Appendix 3746. So, yes, they have one line of attorney argument right against all this other evidence. If I can just go back to Column 14, two final points on that. Number one, and we said this in the briefing, but I think it bears repeating, that the construction that the district court arrived at is actually inconsistent with Column 14 in a critical respect. Column 14 says that you can have a fourth pin that is connected for power, to provide power to the chip, that is connected for power. The construction is the opposite. The construction says you can't. The fourth pin cannot be connected to a power supply. So even if you want to give this phrase in Column 14, in our view, undue weight, it doesn't lead to the district court's construction in fact contradicts it. Wouldn't it lead, though, to a construction that would be even more unfavorable for you? Well, not necessarily. Because then I think, Your Honor, we're in, again, I keep coming back to, it has to be weighed against all of the other uses of present invention and all the other disclosure that's in the specification in arriving at what the claim language means. Okay, again, we're construing the phrase having only three terminals in the claim. We're not looking at all the references in a specification and saying, well, gee, if you look at all of those, and if we were drafting claims, couldn't we draft some claims that were broader than only three? Yes, you could. You could draft broader claims that would be supported by the spec, but that isn't what they did. And, again, I come back to this issue of intent. I am aware of no case, and I don't believe OptiCurrent has cited any case that says a single statement of intent that what we intend to include in the claims, you know, all such variations and modifications, trumps that that statement can trump somehow the plain and ordinary meaning of the claim language and the consistent use of that plain and ordinary meaning in the specification. All right, thank you, counsel. Thank you. Okay, so we have merged the cross-appeal and the appeal together, obviously. And is there, I guess the appellant had its last word, and so did the cross-appellant. So, at this point, the case will be submitted, and the court will be adjourned. Thank you, Your Honors. The Honorable Court is adjourned from day to day.